UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KRISTINA TOT, as Administratrix of the Estate of STJEPAN TOT, on behalf of herself and all others similarly situated, | Case No.: 17 – 8938 |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| | **DEMAND FOR JURY TRIAL** |
| -against- | |
| eCLINICALWORKS, LLC, | |
| Defendant. | |

Plaintiff KRISTINA TOT, by and through her attorneys, Diefenbach, PLLC and the Law Offices of Steven E. Armstrong, PLLC, complain against the defendant and allege the following:

## SUMMARY OF THE ACTION

1.      Plaintiff brings this class action against the defendant eClinicalWorks, LLC ("ECW"), a leading cloud-based Electronic Health Records ("EHR") vendor in the United States used by hospitals, doctors, health groups and other medical providers, for its breach of fiduciary duty and gross negligence in failing to provide, secure and safeguard accurate and reliable health information of patients throughout the United States and for falsely representing that its software complied with requirements for payment of incentives under the Meaningful Use program. EHRs are clinical documents stored electronically. Every patient who has had their EHR stored through ECW rightfully expects that the integrity of their EHRs be maintained, *i.e.*, that they are accurate, not subject to tampering and subject to

1

1  appropriate auditing to ensure modifications are medically appropriate. As detailed herein,

2  ECW has failed millions of patients by failing to maintain the integrity of patients' records.

3  By misrepresenting to the federal government that its software could protect the integrity of

4  patients' records when it could not, ECW also falsely obtained certification from the federal

5  government for its software. As a result, the medical records of millions of patients have

6  been compromised. Patients and doctors cannot rely on the veracity of those records.

7      2.      Pursuant to the Health Information Technology for Economic and Clinical

8  Health Act ("HITECH Act"), the U.S. Department of Health and Human Services ("HHS")

9  established the Medicare and Medicaid Electronic Medical Records Incentive Programs (also

10  known as the "Meaningful Use Program"), which provided incentive payments to healthcare

11  providers who demonstrated "meaningful use" of certified EHR technology.

12      3.      ECW developed and sold EHR software to healthcare providers throughout the

13  United States. ECW falsely represented to its certifying bodies and the United States that its

14  software complied with the requirements for certification and for the payment of incentives

15  under the Meaningful Use program.

16      4.      ECW's software was unable to satisfy certain certification criteria. To ensure

17  that its product was certified and that its customers received incentive payments, ECW: (a)

18  falsely attested to its certifying body that it met the certification criteria; (b) prepared its

19  software in order to pass certification testing without meeting the certification criteria; (c)

20  caused its users to falsely attest to using a certified EHR technology, when ECW's software

21  could not support the applicable certification criteria in the field; and (d) caused its users to

22  report inaccurate information regarding Meaningful Use objectives and measures in

*Left margin (vertical):* DIEFENBACH, PLLC 55 Broad Street, 27th Floor | New York, NY 10004 (212) 981-2233

1   attestations to the Centers for Medicare & Medicaid Services ("CMS").  In addition, ECW

2   provided remuneration to certain customers to recommend its products to prospective

3   customers in violation of the Anti-Kickback Statute.

4       5.      Since 2011, healthcare providers who used ECW's software and attested to

5   satisfying the Meaningful Use objectives and measures received incentive payments through

6   the Meaningful Use program.

7       6.      Had ECW disclosed that its software did not meet the certification criteria, it

8   would not have been certified and its customers would not have been eligible for incentive

9   payments.  In addition, requests for incentive payments that resulted from unlawful kickbacks

10  constituted false claims.

11      7.      As a result of ECW's failure to meet the certification criteria, ECW's software:

12          a.      Periodically displayed incorrect medical information in the right chart

13                  panel of the patient screen;

14          b.      Periodically displayed multiple patients' information concurrently;

15          c.      In specific workflows, failed o accurately display medical history on

16                  progress notes; and

17          d.      ECW audit logs did not accurately record user actions, and in certain

18                  cases, the audit logs misled users as to events that were conducted in

19                  the course of a patient's treatment.

20      8.      As a direct result of these deficiencies in ECW's software, millions of patients

21  have had their medical records compromised, i.e., they can no longer rely on the accuracy and

22  veracity of their medical records.  In other words, as to the Progress Notes recorded by a

1   health professional at a patient's visit, the patient is unable to be certain as to which date any

2   number of symptoms first appeared. Also, because the audit history does not accurately

3   record user actions, there is no way for any patient to know if their records were

4   altered/deleted/modified. In other words ECW, was grossly negligent, or in the alternative,

5   intentionally, coded their software so as to not accurately record user actions in Audit Logs.

6   In one internet chat room visited by doctors using ECW software, one individual states:

7
8
9
10         "So if people could go back in and change Progress Notes, it would not be
possible to recreate the original nor see exactly what changes were made, and
when. This would destroy any evidentiary value the note had.
(http://www.ecwusers.com/index.php/forums/viewthread/2113/)

11
12   ECW either intentionally, or by way of gross negligence, egregious conduct and wanton

13   carelessness, coded their EHR software to allow medical providers to make changes in a

14   Progress Note without an accurate Audit Log.

15                             **PARTIES**

16       9.     Kristina Tot is the Administratrix of the Estate of Stjepan Tot. Both Kristina

17   Tot and the Estate of Stjepan Tot are citizens of New York.

18       10.     ECW is a privately held software company founded in 1999, incorporated in

19   Delaware and headquartered in Massachusetts. ECW was founded by a small group of

20   individuals, including Chief Executive Officer Girish Navani, Chief Medical Officer Rajesh

21   Dharampuriya, and Chief Operating Officer Mahesh Navani. According to its website,

22   ECW's software is used by more than 850,000 users across the United States.

23                      **JURISDICTION AND VENUE**

24       11.     This Court has subject matter jurisdiction over this action pursuant to 28

**DIEFENBACH, PLLC**
55 Broad Street, 27th Floor | New York, NY 10004
(212) 981-2233

4

1 | U.S.C. § 1332. ECW is a citizen of Delaware and the plaintiff is a citizen of New York.

2 |     12.    The Court has personal jurisdiction over ECW and venue is appropriate in

3 | this Court under 28 U.S.C. § 1391(b)(1) & (c)(2) because ECW is a resident of New York for

4 | the purposes of the 28 U.S.C. § 1391.

5 | **LEGAL AND FACTUAL BACKGROUND**

6 | **A.    Certified EHR Technology and the Meaningful Use Program**

7 |     13.    On February 17, 2009, the HITECH Act was enacted to promote the adoption

8 | and meaningful use of certified EHR technology. Under the HITECH Act, the HHS Office of

9 | the National Coordinator for Health Information Technology ("ONC") established a

10 | certification program for EHR technology. As part of the certification program, EHR vendors

11 | attest to ONC authorized certification bodies ("ACB") and accredited testing laboratories that

12 | their software meets the certification requirements established by ONC. The certification

13 | bodies and testing laboratories test and certify that vendors' EHRs are compliant with the

14 | certification requirements.

15 |     14.    Through the Meaningful Use program CMS makes incentive payments to

16 | healthcare providers for demonstrating meaningful use of certified EHR technology.

17 | Individual practitioners ("Eligible Professionals") could qualify for up to $43,720 over five

18 | years from Medicare (ending after 2016) and up to $63,750 over six years from Medicaid

19 | (ending after 2021).

20 |     15.    In order to qualify for incentive payments under the Meaningful Use program,

21 | Eligible Professionals were required, among other things, to: (1) use an EHR system that

22 | qualified as certified EHR technology; and (2) satisfy certain objectives and measures

DIEFENBACH, PLLC
55 Broad Street, 27th Floor | New York, NY 10004
(212) 981-2233

1    relating to their meaningful use of the certified EHR technology.

2        16.     HHS implemented the certification criteria and incentive payment

3 requirements in multiple stages. On January 13, 2010, HHS published in the Federal Register

4 interim final rules setting forth the "2011 Edition" certification criteria and a proposed rule

5 setting forth the "Stage 1" requirements for incentive payments. HHS finalized these

6 rulemakings by publication in the Federal Register on July 28, 2010. In Stage 1, an Eligible

7 Professional's use of certified EHR 6 technology generally needed to satisfy fifteen "core

8 objectives" and five out of ten "menu set objectives."

9        17.     September 4, 2012, HHS published in the Federal Register the final rules

10 setting forth the "2014 Edition" certification criteria and "Stage 2" requirements for incentive

11 payments. In Stage 2, an Eligible Professional' s use of certified EHR technology generally

12 needed to satisfy seventeen "core objectives" and three out of six "menu set objectives."

13        18.     On October 16, 2015, CMS published in the Federal Register a final rule with

14 comment period setting forth the "Modified Stage 2" requirements for incentive payments.

15 For years 2015 through 2017, Modified Stage 2 eliminated the concept of "menu set

16 objectives" and required all Eligible Professionals to attest to a single set of objectives and

17 measures.

18        19.     To qualify for incentive payments in each Stage of the Meaningful Use

19 program, healthcare providers were required to attest each year that they used certified EHR

20 technology and satisfied the applicable Meaningful Use objectives and measures. Use of

21 certified EHR technology and satisfaction of applicable Meaningful Use objectives and

22 measures are material to payment under the Meaningful Use program.

DIEFENBACH, PLLC
55 Broad Street, 27ᵗʰ Floor | New York, NY 10004
(212) 981-2233

20.     To obtain certification, EHR vendors must attest to an ACB that their EHR product satisfies the applicable certification criteria, submit to certification testing by an accredited testing laboratory, and pass such testing.

21.     Certification testing is based on the certification criteria the vendor represents its software satisfies and on which it requests to be tested and certified.  The certification body uses standardized testing protocols ("test scripts"), which identify each step the vendor will be required to take during testing.  The test scripts are available to vendors in advance of their testing date.

22.     After obtaining certification, an EHR vendor must maintain that certification by complying with all applicable conditions and requirements of the certification program. Among other things, the EHR product must be able to accurately, reliably, and safely perform its certified capabilities while in use in doctors' offices.  EHR vendors must cooperate with the processes established by ONC for testing, certifying, and conducting ongoing surveillance and review of certified EHR technology.

23.     The CMS rules governing the Meaningful Use program recognize that healthcare providers rely on certification for assurance that an EHR product meets the applicable certification criteria, including that it possesses the certified capabilities that healthcare providers will need to use to achieve relevant objectives and measures, and that the software will perform in accordance with applicable certified capabilities.

**B.     ECW Failed to Satisfy the Certification Criteria and Made False Statements in Obtaining Certification and Marketing its Software.**

24.     ECW submitted an attestation form dated April 17, 2013 to its ACB

**DIEFENBACH, PLLC**
55 Broad Street, 27th Floor | New York, NY 10004
(212) 981-2233

1 │ representing that its software satisfied the certification criteria applicable to Complete EHRs

2 │ and was capable of performing those criteria and standards in the field.

3 │     25.    ECW's attestation to its certification body was false.  ECW's software did not

4 │ satisfy the certification criteria for a Complete EHR and could not operate in the field in

5 │ compliance with the requisite certification criteria.  Because its EHR technology did not meet

6 │ ONC's certification criteria, its technology also failed to satisfy the requirements for

7 │ Meaningful Use incentive payments, for which the use of certified EHR technology is a

8 │ prerequisite.

9 │     26.    Certification testing does not confirm that each criteria and standard is

10 │ satisfied in full and under every conceivable scenario.  Rather, testing takes a snapshot of a

11 │ product's capabilities by ensuring it can pass certain pre-disclosed test cases.

12 │     27.    ECW could -- and did -- pass certification testing without fully implementing

13 │ all the technological changes required for its 2014 Edition certification.  ECW did not seek to

14 │ ensure that the standards, implementation specifications, and criteria were truly met.

15 │     28.    ECW similarly failed to adequately review its bugs or service tickets to

16 │ analyze whether or not software issues impacted the software's ability to meet the standards,

17 │ implementation specifications, and certification criteria and perform in a reliable manner

18 │ consistent with its certification.

19 │

20 │

21 │ **C. ECW Falsely Attested to Compliance with Certification Requirements and**
22 │ **Hardcoded its Software to Pass Certification Testing**
23 │     29.    Since the start of the Meaningful Use program, eligibility for incentive

**DIEFENBACH, PLLC**
55 Broad Street, 27th Floor | New York, NY 10004
(212) 981-2233

1  payments required Eligible Professionals to use certified EHR technology. An EHR product

2  cannot be certified unless all applicable certification criteria and standards have been met.

3  Certification is material to payment under the Meaningful Use program.

4      30.    Eligibility for Meaningful Use Stage 2 incentive payments required healthcare

5  providers to use certified EHR technology to, among other things, generate and transmit

6  prescriptions electronically (commonly referred to as "ePrescriptions") using the capabilities

7  and standards specified at 45 CFR 170.314(b)(3), which requires the use of Rx.Norm.

8      31.    Rx.Norm is a standardized drug vocabulary that specifies each unique drug,

9  formulation, and dosage. Rx.Norm codes provide a mechanism for ensuring the accuracy of

10  ePrescriptions and for allowing EHR systems to communicate and interact accurately and

11  efficiently with other EHR systems, with pharmacies, and with health information networks.

12      32.    On its application for certification to the 2014 Edition of the certification

13  criteria, ECW attested that it satisfied the requirement to implement the Rx.Norm vocabulary.

14  However, at that time and for years afterwards, ECW had not implemented the Rx.Norm

15  vocabulary into its electronic prescription functions. The attestations related to Rx.Norm in

16  ECW's application for certification were false.

17      33.    In advance of its certification testing, ECW reviewed the publicly available

18  test scripts for ePrescribing and identified the sixteen drugs for which ECW would need to

19  generate a prescription during testing.

20      34.    ECW then "hardcoded" into its testing software only the sixteen Rx.Norm

21  codes it knew in advance that its certification body would test. In other words, rather than

22  programming the capability to retrieve any code from the entire database of Rx.Norm codes,

9

1   ECW simply typed the sixteen Rx.Norm codes necessary for testing directly into its software.

2   ECW hardcoded the requisite Rx.Norm codes for the purpose of making its certification body

3   believe it had implemented the Rx.Norm drug vocabulary and to pass certification testing.

4        35.    During certification testing, the certifying body followed the test scripts that

5   included only the sixteen Rx.Norm codes that ECW knew in advance and had hardcoded into

6   its system. Based on the test results, the certification body certified ECW's software on July

7   24, 2013 as meeting the ONC 2014 Edition requirements for a Complete EHR.

8        36.    In internal communications following certification, ECW employees

9   acknowledged that ECW's software did not transmit Rx.Norm codes for ePrescriptions.

10       37.    In May 2015, ECW was re-tested by its certification body on its ability to

11  transmit Rx.Norm codes as required for ePrescribing. ECW knew in advance that its

12  certification body would simply re-test it using the same testing protocol, including the same

13  sixteen Rx.Norm codes that ECW had hardcoded to pass its original testing in 2013. As a

14  result, despite still failing to transmit Rx.Norm codes, ECW passed this surveillance testing.

15       38.    Instead of adopting Rx.Norm codes, ECW relied on either proprietary drug

16  identifiers developed by private business partners or on National Drug Codes ("NDCs") for

17  purposes of transmitting prescriptions.

18       39.    As with other vendors, in some cases ECW's software did not send accurate

19  NDCs when transmitting medication orders. ECW was aware of this issue and was advised

20  by a third-party business partner in 2014 and 2015 that prescriptions were being sent with

21  drug descriptions that did not match the transmitted NDC.

22       40.    In January 2016, ECW conducted a series of meetings relating to Rx.Norm

*DIEFENBACH, PLLC*
*55 Broad Street, 27th Floor | New York, NY 10004*
*(212) 981-2233*

1    codes and its issuance of inaccurate NDCs.

2        41.    On December 23, 2016, after learning of the Government's investigation,

3    ECW informed HHS that before August 2016, it had not included Rx.Norm codes when

4    transmitting ePrescriptions.  ECW stated that for most customers, it had implemented the

5    Rx.Norm vocabulary for ePrescriptions by August 2016.

6        42.    In addition to Rx.Norm codes, ECW also failed to transmit patient education

7    materials through the required database and universal standard for identifying medical

8    laboratory tests, measurements, and observations: the Logical Observation Identifiers Names

9    and Codes ("LOINC").  On August 23, 2013, in an internal email with the subject line

10   "Patient Education MU Certification," ECW employees confirmed that ECW did not

11   transmit LOINC codes.

12       43.    In February 2014, an ECW employee inquired whether he should contact

13   ECW's certification body and ask if ECW would "be able to meet the certification criteria" if

14   a patient education vendor did not use LOINC codes.  In response, another ECW employee

15   confirmed that ECW did not transmit LOINC codes.

16       44.    On November 9, 2016, ECW disclosed to HHS for the first time that, with

17   respect to a patient education vendor, ECW "retrieved patient education materials for labs

18   using lab names rather than LOINC codes."

19       45.    Likewise, ECW was required to use the Systematized Nomenclature of

20   Medicine - Clinical Terminology ("SNOMED-CT") to specify the medical conditions on a

21   patient's problem list when transmitting a patient's chart. SNOMED-CT is recognized

22   internationally and is available at no cost through the National Library of Medicine.  Using

DIEFENBACH, PLLC
55 Broad Street, 27th Floor | New York, NY 10004
(212) 981-2233

11

1   SNOMED-CT enables providers and electronic medical records to communicate in a

2   common language, thus increasing the quality of patient care across many different provider

3   specialties.  On January 4, 2017, ECW informed HHS that in "certain, specific scenarios," its

4   product did not transmit SNOMED codes.

5   **D.    ECW Failed To Satisfy The Required Certification Criteria**

6       46.     During the time period relevant to this complaint, ECW released software

7   without adequate testing and overly relied on customers to identify bugs and other problems.

8   Some bugs and problems -- even some identified as "critical" or "urgent" -- persisted on

9   ECW's bug list for months and even years.  ECW lacked reliable version control, so

10  problems addressed in one version of the software or for one particular user could reappear in

11  later versions or remain unaddressed for other customers.

12      47.     In 2016, ECW began addressing the above issues by implementing new

13  policies and procedures, improving its documentation, and enhancing its training.  ECW also

14  engaged a third-party consultant to assist it in assessing its processes and to evaluate ways in

15  which it could enhance its product.

16      48.     Also in 2016, ECW issued a series of notices advising its customers of

17  potential problems that arose during particular uses of its software and when certain

18  workflows were utilized by practitioners, including:

19              a.      In certain scenarios, displaying incorrect information relating to labs

20                      and diagnostic imaging orders.  *eClinicalWorks Advisory on Patient*

21                      *Safety, November 4, 2016*;

22              b.      In certain scenarios, issuing incorrect NDCs for prescriptions.

12

DIEFENBACH, PLLC
55 Broad Street, 27th Floor | New York, NY 10004
(212) 981-2233

1        *eClinicalWorks Advisory on Patient Safety, March 11, 2016, p. 6*

2        ("Incorrect mapping may lead to the incorrect drug, drug strength, or

3        drug form being dispensed at the pharmacy.");

4        c.    In certain scenarios, overwriting and/or improperly replicating

5              medication dose, route, frequency, and formulation information.

6              *eClinicalWorks Patient Safety Alert - Overwriting medication*

7              *Information, November 11, 2016; revised November 11/17/16;*

8        d.    Periodically displaying incorrect medical information in the right chart

9              panel of the patient screen. *eClinicalWorks Patient Safety- Progress*

10             *Note Chart Panel Failure to Refresh, July 2016, p. 1* ("Refresh failure

11             ... may cause one or more of the three panels to display the incorrect

12             patient information.");

13       e.    Periodically displaying "[m]ultiple patients' information ...

14             concurrently." *eClinicalW orks Advisory on Patient Safety, March 11,*

15             *2016, p. 21; Resolved Patient Safety Items, August 2016;*

16       f.    In specific workflows, failing to accurately display medical history on

17             progress note. *eClinicalWorks Patient Safety Notice, November 2016,*

18             *p.1; and*

19       g.    Orders placed through order sets that are not associated with a

20             diagnosis code failing to display in progress notes. *eClinicalWorks*

21             *Advisory on Patient Safety, November 4, 2016.*

22   49.  As discussed further below, as a result of these and other issues with its

1  software, ECW failed to satisfy the certification requirements for both the 2011 and 2014

2  Editions.

3  **1.    ECW Failed to Satisfy Data Portability Requirements**

4      50.    To satisfy the 2014 Edition certification criteria, an EHR system must

5  "[e]nable a user to electronically create a set of export summaries for all patients in EHR

6  technology formatted according to the standard adopted at§ 170.205(a)(3) that represents the

7  most current clinical information about each patient. ..." 45 C.F.R. § 170.314(b)(7).

8      51.    In addition to generating a set of export summaries, a certified EHR

9  technology must permit batch export of these summaries in a single export action.  On

10  December 14, 2012, ONC published its "2014 Edition Test Procedure for§ 170.314(b)(7)

11  Data Portability, Approved Test Procedure Version 1.2." That guidance provided: "This test

12  evaluates the ability for EHR technology to create a set of export summaries (according to

13  Consolidated CDA format) for all patients (for example, a batch export) contained within the

14  EHR technology ...."

15      52.    ECW did not comply with these batch export requirements.  In response to

16  user concerns that ECW did not permit batch export, an ECW employee internally confirmed

17  that he did not believe ECW "does a 'batch' process," and that he did not think ECW wanted

18  "to make it easy to extract tons of patient data."

19      53.    In December 2014, an ECW user reminded ECW of prior conversations

20  addressing batch export as part of certification requirements and that he expected ECW to

21  have "figured out a workable solution to this in the past 6 months given the advance

22  warning."

DIEFENBACH, PLLC
55 Broad Street, 27th Floor | New York, NY 10004
(212) 981-2233

14

DIEFENBACH, PLLC
55 Broad Street, 27th Floor | New York, NY 10004
(212) 981-2233

54.    In spring 2015, ECW's certification body concluded that ECW was noncompliant with the data portability requirements.

**2.    ECW's Software Failed to Satisfy Audit Log Requirements**

55.    In order to be certified to the 2011 and 2014 Edition certification criteria, EHR software must reliably and accurately record user actions in an audit log.  Audit logs track user activity in an EHR and provide a chronology of a patient's care.

56.    ECW represented to its certification body that it satisfied this audit log requirement and also represented that "audit logs are also generated for all system adds/deletes/changes to patient records."  However, ECW's audit logs did not accurately record user actions, and in certain cases, the audit logs misled users as to events that were conducted in the course of a patient's treatment.

57.    For example, in 2009, ECW acknowledged that its audit logs incorrectly reflected that diagnostic imaging orders were *created*, when they were only *modified*.  ECW's audit logs also failed to consistently and reliably track deletions of certain medical orders.  In July 2012, ECW acknowledged that its audit logs did not accurately record diagnostic imaging orders.  Again, in June 2013, ECW knew that its access logs were not showing the names of diagnostic imaging orders or the details of what was ordered.

**3.    ECW's Software Failed To Reliably Record Diagnostic Imaging Orders**

58.    To be certified as a Complete EHR under the 2011 and 2014 Edition certification criteria, a vendor's software must provide computerized provider order entry, which requires users to be able to electronically order and record laboratory and radiology/imaging orders.  This functionality must perform accurately and reliably in order to

15

1   meet the certification requirement.

2       59.     In ECW's EHR system, diagnostic imaging orders that were not "linked" to

3   an assessment could fail to display in certain sections of the EHR that providers may rely on

4   to place or follow up on such orders.  Diagnostic imaging orders that were not linked to an

5   assessment may continue to be displayed in the progress note, yet not appear in these other

6   screens.

7       60.     In particular scenarios, ECW's software would represent deleted diagnostic

8   imaging orders as current by displaying the order in the progress note even after it had been

9   deleted.

10      61.     On November 4, 2016, ECW notified its users in a Patient Safety Advisory as

11  to additional issues with its laboratory and radiology/imaging functionalities.

12                                **STJEPAN TOT**

13      62.     Prior to his death from cancer, Stjepan Tot learned about ECW's failure to

14  maintain his medical records in a manner that maintained their integrity.  In particular, he was

15  unable to determine reliably when his first symptoms of cancer appeared in that his medical

16  records failed to accurately display his medical history on progress notes.

17                         **CLASS ACTION ALLEGATIONS**

18      63.     Plaintiff brings this action, pursuant to Fed. R. Civ. P. 23(a), (b)(1), (b)(2), on

19  behalf of a class of consumers ("Class"), consisting of all persons residing in the United

20  States whose physicians used ECW to record and store their medical records at all dates

21  relevant to the facts as alleged herein.

22      64.     Excluded from the Class are ECW and its affiliates, parents, subsidiaries,

DIEFENBACH, PLLC
55 Broad Street, 27th Floor | New York, NY 10004
(212) 981-2233

16

1  current or former employees, officers, directors, and agents at all relevant times.  Also

2  excluded are governmental entities and any judge to whom this case is assigned, their judicial

3  staff, and their immediate families.

4      65.    Plaintiff reserves the right to amend the Class definitions and to add

5  sub-classes as appropriate if discovery and further investigation reveal that the Class should

6  be expanded, otherwise divided into sub-classes, or modified in anyway.

7      66.    Plaintiff satisfies the numerosity, commonality, typicality, and adequacy

8  prerequisites for suing as a represented party pursuant to Fed. R. Civ. P. 23

9      67.    NUMEROSITY.  Joinder of all members of the Class is impractical because

10  approximately 850,000 healthcare providers used ECW's software.  Accordingly, millions of

11  Americans whose medical records are recorded and stored by ECW will be members of the

12  Class.

13      68.    COMMONALITY.  There are questions of law and fact common to the Class

14  and these questions predominate over any questions affecting only individual class members,

15  including:

16      a.    Whether ECW breached a fiduciary duty it owed to the Class;

17      b.    Whether ECW induced the Class members' physicians to breach a

18      fiduciary duty they owed to the Class;

19      c.    Whether ECW intentionally or by way of gross negligence created

20      software that did not reliably and accurately record user actions in an

21      Audit Log for all Class members whose medical providers used ECW.

22      69.    TYPICALITY.  Plaintiff's claim is typical of the claims of the proposed

DIEFENBACH, PLLC
55 Broad Street, 27th Floor | New York, NY 10004
(212) 981-2233

17

1   Class members, as Plaintiff and the members of the Class sustained the same injury arising

2   out of the same wrongful conduct by ECW and their legal claims arise from the same ECW

3   practices, as alleged herein.

4       70.     ADEQUACY.  Plaintiff will fairly and adequately pursue the interests of the

5   Class, and protect those interest.  Plaintiff has no interest that is antagonistic to the members

6   of the Class.  Plaintiff has retained counsel who has experience in complex and class action

7   litigation.

8       71.     Plaintiff and his counsel are committed to vigorously prosecuting this claim

9   on behalf of the Class.  Neither the Plaintiff nor his counsel has conflicts with the interests of

10   the Class.

11      72.     Plaintiff additionally satisfies the requirements of maintaining a class under

12   Fed. R. Civ. P. 23(b)(1), 23(b)(2), and 23(b)(3).  A class action is superior to all other means

13   available in order to adjudicate this controversy in a fair and efficient manner.  Absent a class

14   action, the members of the Class would likely find the cost of litigating their claims

15   prohibitively high and therefore would have no effective remedy at law.  Additionally,

16   prosecution of separate actions by individual members of the Class would create the risk of

17   inconsistent or varying standards for the parties and would not be in the interest of judicial

18   economy.

19      73.     Based on the actions and omissions of ECW, Plaintiff seeks recovery for the

20   claims alleged, infra:

21

22                          **CLAIMS FOR RELIEF**

18

**COUNT I  Breach of Fiduciary Duty**

74.     ECW is a leading cloud-based EHR vendor which holds patients' medical records for the Class.  Upon information, 90% of physicians choose to store their EHRs through ECW. Accordingly, ECW is a fiduciary of the Class.

75.     ECW breached its fiduciary duty to the Class by failing to keep those records in a manner that the integrity of those records would be maintained as described above.

76.     Plaintiff and the Class have been damaged in that no member of the Class can rely on the integrity of their medical records for the time period relevant to the events detailed above.

77.     Accordingly, ECW has breached its fiduciary duty.

**COUNT II  Inducing a Breach of Fiduciary Duty**

78.     The medical providers for Class members owed members of the Class a fiduciary duty to hold its records in a manner that maintained the integrity of those records.

79.     ECW caused the medical providers for the Class to breach that duty by failing to keep those records in a manner that the integrity of those records would be maintained as described above.

80.     Plaintiff and the Class have been damaged in that no member of the Class can rely on the accuracy of their medical records and no member of the Class can be guaranteed that their EHR Audit Logs accurately has recorded user actions such as adds/deletes/changes to their patient records, for the time period relevant to the events detailed above.

81.     Accordingly, ECW has induced a breach of fiduciary duty.

DIEFENBACH, PLLC
55 Broad Street, 27th Floor | New York, NY 10004
(212) 981-2233

19

**COUNT III Gross Negligence**

78.    ECW owed members of the Class a duty to hold its records in a manner that maintained the integrity of those records.

79.    ECW was grossly negligent by failing to keep those records in such a manner that the integrity of those records would be maintained as described above.

80.    Plaintiff and the Class have been damaged in that no member of the Class can rely on the accuracy of their medical records and no member of the Class can be guaranteed that their EHR Audit Logs accurately recorded user actions such as adds/deletes/changes to their patient records, for the time period relevant to the events detailed above.

81.    Accordingly, ECW is grossly negligent.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the proposed class, requests that the Court:

a.    Certify this case as a class action on behalf of the Class as defined above, appoint Kristina Tot, as class representative and appoint Diefenbach, PLLC and the Law Offices of Steven E. Armstrong, PLLC as class counsel;

b.    Award punitive damages to the Plaintiff and class members; and

c.    Award Plaintiff and class members their reasonable litigation expenses and attorneys' fees;

d.    Award such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff hereby demands a jury trial on all issues so triable.

20

DIEFENBACH, PLLC
55 Broad Street, 27th Floor | New York, NY 10004
(212) 981-2233

Dated: New York, New York
        November 14, 2017

Respectfully submitted,

DIEFENBACH, PLLC

By: _____

Gordon Price Diefenbach
Attorney(s) for Plaintiff
55 Broad Street, 27TH Floor
New York, NY 10004
Tel: (212) 981-2233
Fax: (646) 867-1150
Email: gordon@diefenbachlaw.com

LAW OFFICES OF
STEVEN E. ARMSTRONG, PLLC

By: _____

Steven E. Armstrong
Attorney(s) for Plaintiff
26 Broadway, 17th Floor
New York, NY 10004
Tel: (646) 708-3658
Fax: (212) 344-7285
Email: sarmstrong@armstrongpllc.com

55 Broad Street, 27th Floor | New York, NY 10004
(212) 981-2233

21